# In the United States Court of Federal Claims

No. 17-86C
(Bid Protest)
(Filed: May 23, 2017)[1]

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * *
                                         *
HARMONIA HOLDINGS GROUP, LLC,            *
                                         *
                  Plaintiff,             *
                                         *     Pre-award Bid Protest; 28 U.S.C.
       v.                                *     § 1491(b); Standing; Corrective
                                         *     Action; Amended Request for
THE UNITED STATES,                       *     Quotations; Key Personnel
                                         *     Qualifications; Price Realism;
                  Defendant,             *     Favoritism; Bad Faith.
                                         *
       and                               *
                                         *
JAVA PRODUCTIONS, INC.,                  *
                                         *
                  Intervenor.            *
                                         *
* * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

Kathryn V. Flood, Antonio R. Franco, Michelle E. Litteken, and Julia Di Vito, PilieroMazza PLLC, 888 17th Street NW, 11th Floor, Washington, D.C. 20006, for Plaintiff.

Alison Schilling Vicks, U.S. Department of Justice, Civil Division, P.O. Box 480, Ben Franklin Station, Washington, D.C., 20044, for Defendant.

William Alexander Wozniak, Williams Mullen, PC, 8300 Greensboro Drive, Suite 1100, McLean, VA 22102, for Intervenor.

---

[1] The Court issued this Opinion and Order under seal on May 2, 2017, and directed the parties to file any proposed redactions by May 11, 2017. The parties could not fully agree on redactions, and the Court denied some of Plaintiff's proposed redactions. On May 15, 2017, the Court issued under seal a proposed redacted Opinion and informed the parties that the Court would issue a public version of its Opinion after May 22, 2017. The Court publishes this Opinion correcting errata and indicating redactions by asterisks "[***]."

## OPINION AND ORDER

**WILLIAMS,** Judge.

In this preaward bid protest, Plaintiff Harmonia Holdings Group, LLC ("HHG") challenges the Department of the Interior's ("DOI") corrective action in issuing an amended Request for Quotations ("RFQ") following Plaintiff's initial GAO protest. Plaintiff alleges that DOI's revisions to the RFQ - - adding heightened requirements for key personnel, explicitly providing for a price realism analysis, further detailing database modernization planning requirements, and soliciting a Quality Control Plan instead of a Quality Assurance Surveillance Plan - - do not reflect the agency's needs and favor the incumbent Java Productions, Inc. ("JPI"). Because DOI's amendment of the RFQ reasonably reflected the Government's needs, the protest is denied.

### Findings of Fact[2]

In this procurement, the Small Business Administration's ("SBA") Office of Disaster Assistance ("ODA") sought maintenance and service for reporting systems for the Disaster Credit Management System ("DCMS"). AR 8, 506. DCMS is a "mission critical system" ODA uses to process, disburse, and modify disaster home and business loans to rebuild property damaged by "qualifying disaster events." AR 19. ODA's DCMS "handles custom report requests initiated by the U.S. Congress, the White House, and other stakeholders within SBA and the federal government regarding disaster loan processing operations." AR 506.

### The Original Request for Quotations

On June 24, 2016, DOI's Interior Business Center, Acquisition Services Directorate issued RFQ No. D16PS00280 on behalf of SBA. AR 19. The RFQ anticipated award of a firm fixed price task order. AR 19. The acquisition, a 100% set aside for HUBZone businesses, was to be conducted utilizing FAR Part 8.4, and the task order was to be awarded under GSA Schedule 70[3] Special Item Number 132-51.[4] The Independent Government Estimate ("IGE") for the task order was $3,743,853.92 for the base and four option years. AR 11.

---

[2]   The findings of fact are derived from the Administrative Record.

[3]   Schedule 70 is a multiple award schedule under GSA's Federal Supply Schedule program that lists vendors providing IT products and services to the Government.

[4]   A Special Item Number (SIN) covers a group of generically similar (but not identical) supplies or services that are intended to serve the same general purpose or function. 48 C.F.R. § 8.401 (2014). SIN 132-51, titled Information Technology Professional Services, includes resources and facilities management, database planning and design, systems analysis and design,

According to the RFQ's Statement of Work, the objective of the acquisition was to "identify reporting needs, develop, create, modify, test, and deliver all reports in support of ODA on the DCMS system and sub-systems." Section 2 of the RFQ, the Scope of Work, required the contractor to prepare a Task Order Management Plan, and a Performance Work Statement and Quality Assurance Surveillance Plan. AR 20-21, 25. The Scope of Work also provided that the contractor would participate in DCMS modernization planning – "assuming the role of subject matter expert for current and future DCMS database design and reporting requirements." AR 22.

Section 3 of the RFQ, General Task Order Terms and Conditions, identified three labor categories as key personnel – Senior Computer Systems Analyst, Senior Application Engineer and Software Systems Engineer. AR 29-30. Section 3.10 stated that key personnel would be "[c]ertain skilled experienced professional and technical personnel" that were "essential for accomplishing the work to be performed." AR 29. No substitutions could be made for "accepted key personnel except for sudden illness or death, or termination of employment." AR 29.

After issuing the RFQ, the agency received a number of questions from vendors. See AR 710-11. One vendor asked "[i]n [section] 3.12, for key personnel, what are the required qualifications for the 3 key personnel?" AR 713. The agency responded stating "Qualifications of key personnel are expected to support the experience requested in Section 2.2.5 – Technical Skill sets." AR 713. Section 2.2.5 stated that "[t]he contractor shall provide staff experienced with SQL, Crystal Reports, Microsoft Office Suite, Visual Basic 6, XI R2, SMPT, FTP, ASP.net programming languages." AR 21. The RFQ did not specify the requisite education or years of experience for key personnel. The Government's responses to vendors' questions were later incorporated into the RFQ through a modification. AR 52.

The RFQ provided that proposals were to contain a technical submission and a price submittal. AR 31-32. Contractors were to provide a technical quote that addressed:

(a) Understanding, Planning and Technical Approach

(b) Qualifications and Commitment of Personnel

(c) Past Performance

AR 31.

For "Understanding, Planning and Technical Approach," the RFQ provided that the following evaluation criteria would be utilized to determine whether an offeror was technically acceptable:

- Understanding of the scope and subject matter

- Quality and effectiveness of the approach to carry out the Statement of Work

---

network services, programming, conversion and implementation support, network services project management, and data/records management.

3

- Quality and effectiveness of the approach to produce logical, useful information, including all required technical documents, manuscripts, and publications

- Awareness of potential problems and demonstrated ability to resolve them

- A demonstrated working relationship with any subcontractor established at the time of quote submission

AR 34.

For "Qualifications and Commitments of Personnel" the following evaluation criteria were to be utilized:

- Identify key technical individuals and fully describe the relevant qualifications and tasks which you will assign to each individual.

- Indicate any positions necessary for contract performance that are not presently filled and the anticipated date of assignment or new hire.

- Fully describe other project and time commitments for all key personnel during the study.

AR 35.

The RFQ provided that contractors' price quotes had to "include a breakout to identify the price for the different tasks in the statement of work." Specifically, contractors were instructed to provide:

> the labor categories and labor mix appropriate for their proposed solution to meet the requirements of this effort, a description of the skills and experience per task, and the fixed price hourly rate(s) proposed, and any other proposed associated costs, for calculating the quoted price for this effort. The price submission must have a total estimate for each of the contract years and the entire period of performance, inclusive of the option years. Your price portion must clearly identify your basis of estimate for the entire period of performance for this effort.

AR 32.

The RFQ informed offerors that price quotes would be evaluated separately from technical quotes and the Government would "evaluate the quoted prices for reasonableness by utilizing price analysis techniques." AR 35. The RFQ reiterated that each offeror was expected "to quote a reasonable price" and that evaluators would "consider whether the cost/price adequately reflect[ed] an understanding of the project" and was "consistent with the technical proposed solution." AR 35.

Finally, the RFQ noted how the Government would assess potential price risk:

> [e]ach price quote will be assessed to identify potential risk. Price risk refers to any aspect of a contractor[']s quote which could have significant negative cost/price consequences for the Government. Where risk is assessed it may be described in qualitative terms or used as a best-value discriminator.

AR 35.

Each offeror needed a minimum "Acceptable" rating in all factors and subfactors to be considered for award. AR 34. According to the RFQ, the Government would utilize a trade-off analysis and make award on a best value basis. AR 34. The Government's stated goal was to obtain "the highest technical quality considered necessary to achieve the project objectives, with a realistic and reasonable price." AR 34. In the event that submissions were evaluated as technically equal in quality, price would become a "major consideration in selecting the successful offeror." AR 34.

**Technical and Price Evaluation**

Six contractors, including HHG and JPI, timely submitted quotations. AR 435. The evaluators used the following adjectival rating scale to evaluate the proposals:

| | |
|---|---|
| **Excellent** | **Very Low Risk** |
| **Very Good** | **Low Risk** |
| **Satisfactory** | **Moderate Risk** |
| **Poor** | **High Risk** |
| **Unacceptable** | **Unacceptable Risk** |

The evaluators determined that four offerors – [***], did not provide letters of commitment from their key personnel. AR 395, 409, 416, 430. The Government also determined that four offerors – [***] did not "map" their key personnel to GSA labor categories, causing the Government to question whether these offerors proposed key personnel with sufficient experience. AR 398, 412, 426, 433.

The highly discounted labor rates of three offerors - - [***] - - prompted Government uncertainty as to whether these offerors could provide sufficiently qualified personnel. AR 398, 412 ("The discounted pricing is low it doesn't ensure that we will get the necessary experienced level of contractor needed for the job."); AR 426 ("The rate for the Software System engineer is much lower than expected. It is uncertain to what level skill set the software engineer will provide."). Specifically, evaluators had concerns about an apparent inconsistency between [***] technical proposal and its price quote and noted in the price evaluation that [***] provided "[n]o explanation of labor categories with experience/skill detail. Labor categories bid do not match the

technical skill set required by SOW. Labor categories appear significantly junior to the Key Personnel provided in the technical quote." AR 398.

The technical evaluators rated offerors' technical proposals as follows:

| Vendor | Understanding, Planning and Technical Approach | Management and Technical Approach and Personnel Qualifications | Past Performance | Overall Technical Rating |
|---|---|---|---|---|
| HHG | Satisfactory | Very Good | Very Good | Very Good |
| JPI | Excellent | Excellent | Excellent | Excellent |
| [***] | Very Good | Very Good | Excellent | Very Good |
| [***] | Poor | Unacceptable | Poor | Poor |
| [***] | Unacceptable | Unacceptable | Unacceptable | Unacceptable |
| [***] | Poor | Poor | Poor | Poor |

AR 392, 399, 406, 413, 420, 427.

The evaluators made the following determinations regarding offerors' price quotations:

| Vendor | Total Pricing | Integrated Assessment |
|---|---|---|
| HHG | $ [***] | Poor |
| JPI | $ 3,400,900.00 | Excellent |
| [***] | $ [***] | Poor |
| [***] | $ [***] | Unacceptable |
| [***] | $ [***][5] | Unacceptable |
| [***] | $ [***] | Unacceptable |

AR 398, 405, 412, 419, 426, 433, 442. Based on these evaluations, three offerors – [***] were deemed to be in the competitive range. AR 441.

---

[5]   [***] proposed a price of $[***] for the base year and the same price for each option year. AR 288. In its award decision, the Government erroneously did not add [***] price proposal for the base year and each option year, instead showing a price of $[***] for the base year, each of the option years, and the total. AR 442.

6

**Award**

On August 1, 2016, DOI selected JPI for award. AR 434. The award decision clarified that the agency was not utilizing a performance-based contracting approach and noted that JPI was the "only offeror to receive an 'Excellent' rating in all non-price factors." AR 441. The decision continued that, although JPI's quote was [***] and $[***] higher than HHG's, it [***] the Independent Government Estimate. AR 443. Regarding HHG's discounted rates, the award decision stated: "although the Government seeks to obtain discounts, the rates quoted must demonstrate to the Government that the Offeror understands the knowledge, skills and abilities required for the effort. [HHG's] rates appear to be discounted to the point where it would be questionable if the Offeror would obtain personnel with the requisite experience." AR 443.

**Notification of Award and Debriefing**

On September 15, 2016, Contracting Officer Tonya Lovelace notified HHG that DOI had determined that award to JPI was in the best interest of the Government. AR 476. On September 29, 2016, CO Lovelace provided HHG a brief explanation as to why HHG had not been selected for award, as required by FAR Part 8. AR 483, 485. CO Lovelace stated that HHG had received an overall technical rating of "Very Good" and that its quote "demonstrated a good overall understanding of the scope of the Statement of Work and proposed well defined ways to address the scope requirements." AR 485. CO Lovelace provided the following list of weaknesses in HHG's quote that "significantly impacted" DOI's award decision:

- The modernization requirements were addressed as an upgrade and not a transition to a different database

- Penalties/cost adjustments were not highlighted

- A deliverable schedule was not provided

- An understanding of potential problems with report generation, self-service reporting or migration was not described or demonstrated

- Resumes and additional letters of intent were not included for key personnel

- Labor category descriptions, to include experience and skill level details, were missing for the proposed Software/IS Specialist II and Software/IS Specialist III, respectively, which did not allow the Government to discern if the proposed senior level labor categories would pose a risk to performance

- Although this is a firm fixed price task order, the significantly discounted rates posed significant risk to the completion of the requirements of this task order.

AR 485.

**Initial Protests and Corrective Action**

On September 26, 2016, HHG filed a bid protest with the Government Accountability Office ("GAO"), challenging DOI's award of the task order to JPI, and on October 7, 2016, HHG supplemented its GAO protest. AR 486, 516-35. HHG alleged that although DOI downgraded

HHG's proposal because the "modernization requirements were addressed as an upgrade and not a transition to a different database," the RFQ contained no requirement that offerors propose a plan for transition to a different database. AR 520-21. Additionally, HHG complained that it had received a weakness for omissions that were not required in the RFQ - - failing to highlight penalties/cost adjustments and to provide a "deliverable schedule." AR 521-22. Finally, HHG claimed that DOI 1) overlooked relevant information in HHG's proposal regarding key personnel and labor categories, 2) improperly conducted a price realism analysis, 3) "Treated JPI's Proposal as the Standard for Technical Acceptability" rather than evaluating proposals based on the RFQ, and 4) made an unreasonable best value determination - - failing to justify a [***]% price premium for JPI's proposal. AR 525-29.

DOI's Head Contracting Authority issued a partial override of GAO's automatic stay, permitting partial performance to continue under JPI's task order No. D16PD00878. AR 512.

### SBA's Response to HHG's GAO Protest

In response to HHG's protest, SBA conceded that it assigned weaknesses to HHG for failing to include items not required in the RFQ **- -** penalties/cost adjustments or a deliverable schedule - - and that HHG had provided the required information for its key personnel. AR 536-37. Although it had concerns about key personnel, SBA determined that it could only hold HHG to the minimum requirements of the labor categories that HHG mapped to the key personnel in the RFQ. AR 538-39. SBA rejected HHG's challenge to a price realism analysis and reiterated that HHG's price proposal was "poor" and posed significant risk to the government. AR 541.

DOI informed GAO that it would take the following corrective action:

- Amend the solicitation to detail the agency's minimum needs and ensure that supplemental proposals are more uniformly responsive to those needs;

- Invite supplemental technical and cost proposals from HHG, JPI, and any other offeror(s) that had a reasonable chance of award;

- Review all proposals according to the requirements set forth in the amended solicitation;

- Make a new best value determination.

AR 543.

### HHG's Objection to the Proposed Corrective Action

On October 25, 2016, HHG filed an objection with GAO to the agency's decision to amend the RFQ, asserting that the proposed corrective action was "merely an attempt to change the evaluation criteria and retroactively justify its flawed evaluation," given that the original RFQ already set forth the Agency's minimum needs. AR 552.

**GAO's Dismissal of HHG's Protest**

On November 7, 2016, in light of DOI's decision to take corrective action, GAO dismissed HHG's protest as academic, and concluded that HHG's objection to the forthcoming amendments to the RFQ was premature and speculative.  AR 556-57.

**The Amended RFQ**

On December 15, 2016, DOI issued an amended RFQ, containing the following changes:

- The requirement for a "Quality Assurance Surveillance Plan" was replaced with a "Quality Control Plan."  Compare AR 20-21 with AR 612-13.

- **DCMS Modernization Planning –** The original RFQ simply stated that the contractor "shall participate in DCMS Modernization Planning," while the amended RFQ amplified this requirement and set forth details on the scope of DCMS modernization activities including the contractor's role and responsibilities.  Compare AR 22 with AR 614.

- **Key Personnel** Definition – The original RFQ contained no requirement for contractors to cross reference their GSA Schedule IT-70 labor categories with those in the RFQ and did not require contractors to submit signed letters of commitment.  See AR 29-30.  The amended RFQ requires that "contractor[s] shall cross reference their GSA Schedule IT-70 labor categories with those listed in section 3.12 and provide skill set, education and experience descriptions and complete resumes for all proposed key personnel.[6]  The contractor shall submit signed letters of commitment for all key personnel."  AR 622.

- **Key Personnel Designation** – The original RFQ did not contain specific education, experience, or skills required for each key personnel section, providing only the job title and the number of personnel required.  AR 30.  The amended RFQ added the following education, experience, and skill requirements:

| Title | Education, Experience, and Skill Set | # |
|---|---|---|
| Senior Computer Systems Analyst | Min BA/BS. Min. 10 years' experience using SQL, Crystal Reports, Microsoft Office Suite, Visual Basic, XI R2, SMPT, FTP, and ASP.net programming languages | 1 |

---

[6]  A cross-reference or "crosswalk" is the analysis of whether the labor categories proposed by each offeror are substantially equivalent to labor categories in the solicitation.  See Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 743 (2008).

9

| Senior Application Engineer | Min BA/BS. Min. 10 years' experience using SQL, Crystal Reports, Microsoft Office Suite, Visual Basic, XI R2, SMPT, FTP, and ASP.net programming languages | 1 |
|---|---|---|
| Software Systems Engineer | Min BA/BS. Min. 6 years' experience using SQL, Crystal Reports, Microsoft Office Suite, Visual Basic, XI R2, SMPT, FTP, and ASP.net programming languages | 1 |

AR 622.

- **Technical Quote and Price** – The original RFQ did not explicitly provide for a price realism analysis but noted that the Government's objective was "to obtain the highest technical quality considered necessary to achieve the project objectives, with a realistic and reasonable price." AR 34. The Amended RFQ provides that "[a] price realism analysis may be conducted to determine whether prices are so low that it reflects a lack of technical understanding" and that "[p]roposals may be rejected for offering unrealistically low prices." AR 623, 628.

- **Understanding, Planning and Technical Approach** – The amended RFQ provides that contractors will be evaluated on the "[a]dequacy of the proposed labor categories and level of effort," while the original RFQ included no such evaluation factor. Compare AR 34 with AR 627.

- **Qualifications and Commitments of Personnel** – The amended RFQ provides that offerors will be evaluated on whether they "[p]rovide signed letters of commitment for proposed key personnel" and that "[g]reater years of experience will merit a higher evaluation rating." AR 627. The original RFQ did not contain such evaluation criteria. See AR 35.

**HHG's Second GAO Protest**

The deadline for submission of revised proposals was extended to January 19, 2017, and on January 10, 2017, HHG filed a second GAO protest challenging the corrective action, i.e., the amendments to the RFQ. AR 658. On January 17, 2017, HHG withdrew its GAO protest and filed this action the next day.

## Discussion

Plaintiff alleges that DOI's corrective action was infirm in two respects: 1) amending the RFQ rather than simply reevaluating proposals against the original RFQ and 2) favoring JPI by

10

adding heightened requirements for key personnel, permitting the agency to conduct a price realism analysis, further detailing contractor responsibilities for database modernization planning and replacing the requirement for a Quality Assurance Surveillance Plan with a Quality Control Plan. Pl.'s Mot. 18-25.

Defendant seeks dismissal on standing grounds or alternatively contends that this reprocurement is rational and does not favor JPI.

**Jurisdiction**

This Court has jurisdiction over bid protest actions pursuant to 28 U.S.C. § 1491(b) (2012) ("[Court of Federal Claims] . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."). The Court's bid protest jurisdiction includes protests of an agency's corrective action. See Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012).

**Standing**

Defendant contends that Plaintiff lacks standing. "[S]tanding is a threshold jurisdictional issue." Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002). In a bid protest action, a plaintiff must meet the standing requirements of Article III of the United States Constitution as well as the Tucker Act. Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). The Tucker Act imposes "more stringent standing requirements than Article III." Id. To have standing to bring a bid protest action, a plaintiff must be an "interested party" within the meaning of § 1491(b)(1). See Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006). To qualify as an interested party, a plaintiff must satisfy a two-part test: 1) be an actual or prospective bidder and 2) have a direct economic interest in the procurement. See id.

Because Plaintiff was a qualified offeror in the competitive range under the original RFQ and filed a protest challenging the amended RFQ prior to the close of bidding, Plaintiff qualifies as a prospective offeror. CGI Fed., Inc. v. United States, 779 F.3d 1346, 1349 (Fed. Cir. 2015). In a preaward protest, to satisfy the requirement for direct economic interest, a protestor must allege a "non-trivial competitive injury which can be redressed by judicial relief." Id. at 1351 (internal citation and quotation marks omitted). In claiming that the agency's "introduction" of a price realism analysis and the heightened experience requirements for key personnel do not reflect the agency's needs, but instead are designed to favor another bidder, Plaintiff has alleged a non-trivial competitive injury. Weeks Marine, 575 F.3d at 1362; see Prof'l Serv. Indus., Inc. v. United States, 129 Fed. Cl. 190, 201 (2016).

**Standard of Review**

The Court evaluates bid protests under the Administrative Procedure Act's standard of review. Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Under this standard, the Court will not set aside an agency's procurement decision, unless the agency abused its discretion or acted arbitrarily, capriciously, or otherwise not in accordance with

law. 5 U.S.C. § 706(2)(A) (2012); Adams & Assocs., Inc. v. United States, 741 F.3d 102, 105-06 (Fed. Cir. 2014); Ala. Aircraft Indus., Inc. - Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009). The Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974). If the Court finds that the agency's actions were contrary to law or regulation, the plaintiff must also show that the violation was prejudicial in order to obtain relief. Bannum, 404 F.3d at 1351; Caddell Constr. Co. v. United States, 125 Fed. Cl. 31, 51 (2016).

Under Rule 52.1 of the Rules of the Court of Federal Claims, the parties are limited to the AR, and the Court makes findings of fact as if it were conducting a trial on a paper record. See Bannum, 404 F.3d at 1354. In the examination of the AR, the Court must determine whether a protester has met its burden of proof based on the evidence in the record. Id. at 1355 (internal citations omitted).

**The Scope of DOI's Corrective Action**

"[T]he Court has long recognized that contracting officers have 'broad discretion to take corrective action where the agency determines that such action is necessary to ensure fair and impartial competition.'" SOS Int'l LLC v. United States, 127 Fed. Cl. 576, 585 (2016) (quoting Amazon Web Servs., Inc. v. United States, 113 Fed. Cl. 102, 115 (2013)). "The contracting agency does not have to 'admit an error' prior to its decision to pursue corrective action." Wildflower Int'l, Ltd. v. United States, 105 Fed. Cl. 362, 386 (2012) (quoting ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 72 (2001)). "[I]n considering the propriety of an agency's corrective action, the court must consider whether the agency's decision was 'reasonable under the circumstances.'" WHR Grp., Inc. v. United States, 115 Fed. Cl. 386, 395-96 (2014) (quoting Sheridan Corp. v. United States, 95 Fed. Cl. 141, 151 (2010)). The agency's "reason for the corrective action must be supported by the evidence in the record." Sheridan, 95 Fed. Cl. at 151. An agency cannot meet this bar unless it examined the relevant data and articulated a coherent and reasonable explanation for its decision. WHR Grp., Inc., 115 Fed. Cl. at 396 (citing Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S 29, 43 (1983)).

Here, the parties agree that corrective action was warranted but dispute the scope of proper corrective action. Defendant asserts that the agency's issuance of an amended RFQ that reflects the agency's needs was appropriate. Plaintiff contends that because DOI took corrective action to remedy errors in the evaluation, not errors in the terms of the RFQ, amendment of the RFQ rather than a reevaluation of existing offers, went too far and was not "rationally related to the defect to be corrected." Pl.'s Mot. 18, 21. Preventing an agency from correcting errors just because they were not pointed out by a protestor, would unduly hamstring an agency and detrimentally affect the procurement process. To force an agency to make an award under a solicitation it deems flawed would make no sense and perpetuate error.

In any event, in the instant case, the evaluation errors the protest identified were not as divorced from errors in the original RFQ as Plaintiff suggests. Rather, the evaluation problems that surfaced in the protest - - in particular the exceptionally low pricing - - brought to light deficiencies in the RFQ in areas where the agency had understated, or ambiguously stated, its needs. In reviewing the allegations in Plaintiff's initial GAO protest, the agency became aware that the original RFQ did not contain the criteria necessary to obtain sufficiently experienced key personnel.

In the price evaluation, the evaluators noted that in Plaintiff's proposal the Senior Computer Systems Analyst was given a GSA crosswalk Labor Category of [***], which is not the senior level labor category and has a minimum of only [***] years of experience.  The evaluators concluded that this lack of seniority posed a significant risk to the Government due to the experience needed to perform the Statement of Work.  AR 398.  The evaluators also had concerns about [***] price, noting that that the pricing was so low as to cause concern that the agency would not receive the level of experience necessary for the job, and the minimum qualifications proposed in the labor categories did not meet the Statement of Work's needs for key personnel.  AR 412.  Additionally, the evaluators noted that [***] Senior Computer Systems Analyst did not have the required experience, which posed "significant risk to the government" and the rate for its Software System Engineer was much lower than expected, raising questions about the skill level of the software engineer.  AR 423, 426.  Based on these concerns the evaluators assigned these offerors weaknesses and rated their price proposals as either poor or unacceptable.  AR 398, 412, 422, 426.

In reviewing the allegations in HHG's initial protest, the agency recognized that it could not hold HHG (and other offerors) to more stringent experience requirements than were set forth in the original RFQ.  AR 538-39.  The original RFQ did not include any minimum education or experience requirements for key personnel or require offerors to cross-reference their GSA Schedule IT-70 labor categories with the designated key personnel.  See AR 30.  For each key personnel position, the agency added the requirement of a Bachelor of Arts or a Bachelor of Science degree.  In addition, for the Senior Computer Systems Analyst position and the Senior Application Engineer positions, the agency set a minimum of 10 years of experience working with specified software programs and for the Software Systems Engineer, a minimum of six years of experience with these programs.  AR 589.  The agency also directed offerors to "cross reference their GSA Schedule IT-70 labor categories with those listed in section 3.12 [Key Personnel]" and "submit signed letters of commitment for all proposed key personnel."  AR 622.

Upon realizing that its RFQ failed to specify the requisite education and experience, the agency acted reasonably in amending the solicitation.  In a procurement where the Government's stated objective was to "obtain the highest technical quality" for the agency's "highly unpredictable" workload, which required contractor "flexibility to meet changing capacity needs" in the event of a "disaster activity surge," it was reasonable for the agency to amend the solicitation to ensure that it could obtain key personnel with sufficient education and experience for successful task order performance.

**The Price Realism Requirement**

Plaintiff contends that the agency's "introduction" of a price realism methodology in the amended solicitation was irrational, that the AR does not support a need to add a price realism analysis, and that the only reason to add this requirement was to "penalize offerors that proposed a lower price."  Pl.'s Mot. 24.  In fixed-price procurements such as this, the agency ordinarily does not consider the "realism" of offerors' proposed prices, because the contractor bears the risk of underpricing its offer.  See Ceres Envtl. Servs., Inc. v. United States, 97 Fed. Cl. 277, 303 (2011) (citing Fulcra Worldwide, LLC v. United States, 97 Fed. Cl. 523 (2011); see also Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 356 (2009).  However, even in a fixed-price procurement, it is within an agency's discretion to provide for a price realism analysis "to measure an offeror's understanding of the solicitation requirements, or to avoid the risk of poor performance from a contractor who is forced to provide goods at little or no profit."  Ceres, 97 Fed. Cl. at 303.

13

Here, proposed low pricing on the part of three offerors gave the agency sound reason to both question their ability to perform and to clarify that price realism might be evaluated. During the technical evaluation, evaluators became concerned that Plaintiff had not proposed sufficiently experienced personnel to meet the demands of the project because its proposed pricing and labor categories were "not in line with the [Independent Government Estimate]." AR 398. Plaintiff's price quote was substantially below the IGE - - $[***], [***]% [***] of $[***]. Additionally, evaluators noted that [***] discounted pricing was low and did not "ensure we will get the necessary experienced level of contractor needed for the job," and that [***] price quotation for the Software Engineer was "much lower than expected," making it uncertain what level skill the software engineer would provide. AR 412, 426; see Rotech Healthcare, Inc. v. United States, 121 Fed. Cl. 387, 403 (2015) ("A 'price realism' analysis may be called for if a bidder's price appears to be 'so low that performance of the contract will be threatened.'" (quoting DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 657 n.5 (2010))).

The original RFQ had adequately put offerors on notice that their prices should be realistic as well as reasonable when it informed offerors that the agency sought to obtain services with a "realistic and reasonable price" and that, in evaluating price quotes, it would consider whether the quote reflected "an understanding of the project." AR 34-35; see also AR 34 (providing that understanding the scope of the subject matter was an express technical evaluation factor). Nonetheless, given Plaintiff's GAO protest that the RFQ did not give offerors adequate notice, it was reasonable for the agency to amend the RFQ to more explicitly state that the agency might conduct a price realism analysis.

**Other RFQ Amendments**

Plaintiff's remaining two quibbles with the amendments to the RFQ can be summarily denied. First, Plaintiff contends that the amended RFQ's replacement of a Quality Assurance Surveillance Plan ("QASP") with a Quality Control Plan ("QCP"), does not reflect the agency's requirements. However, replacing the QASP (which required a plan for measuring performance against standards) with a QCP, resolved an ambiguity as to whether this was a performance-based acquisition requiring a deliverable schedule and penalties/cost adjustments. See AR 20-21; 48 C.F.R. § 37.601 (2006) (providing that performance-based contracts for services shall include "[m]easurable performance standards (i.e., in terms of quality, timeliness, quantity, etc.) and the method of assessing contractor performance against performance standards").

Second, Plaintiff contends that the agency's decision to amend the DCMS Modernization and Planning Requirement was unreasonable because the amendment simply reflected JPI's original proposal. The original RFQ required the contractor to "participate in DCMS modernization planning, assuming the role of subject matter expert for current and future DCMS database design and reporting requirements." AR 22. The amended RFQ clarified that the contractor's modernization planning responsibilities did not include "the development of a new database" or the "migration of data from the legacy to the modernized database" and added a list of specified modernization planning activities. AR 614; see AR 561. Such clarification was within the agency's discretion.

**Plaintiff Has Not Established Favoritism or Bias**

Finally, Plaintiff argues that "[b]ecause revising the RFQ was not necessary to remedy DOI's evaluation defects, it is clear that DOI revised several of the original RFQ requirements to tailor this evaluation in favor of DOI's prior awardee, JPI." Pl.'s Mot. 22. Plaintiff further asserts that DOI intended to "'hardwire' this award for JPI." Id. While Plaintiff does not explicitly allege bias or bad faith, Plaintiff in essence claims that, in taking corrective action, the agency intended to direct the award to JPI. The record contains no support for this serious allegation which is tantamount to charging the agency with bad faith.

A protestor can show an agency acted in bad faith if its allegations are supported by "almost irrefragable" proof. Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting Info. Tech. Applications Corp. v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003)). "Almost irrefragable proof" amounts to "clear and convincing evidence" of some "specific intent to injure" the protestor. Id. (internal citations and quotation marks omitted). In claiming favoritism, Plaintiff contends that, because the original RFQ reflected the agency's needs, the amendments to the RFQ cannot reflect the agency's needs, but rather serve to "shore up its decision to award the contract to JPI." Pl.'s Mot. 11. From this convoluted and speculative construct, Plaintiff concludes that "[i]t is clear that JPI's proposal dictated the needs of the Agency." Id. at 27. Plaintiff's arguments of favoritism are insinuations that JPI was given a competitive advantage under the amended RFQ because its original proposal appeared to be responsive to the revised terms of the amended solicitation. Plaintiff failed to demonstrate via "clear and convincing evidence" that the agency acted in bad faith either to tailor a new award to JPI, or injure Plaintiff.

**Conclusion**

Defendant's motion to dismiss for lack of standing is **DENIED**.

Plaintiff's motion for judgment on the AR is **DENIED**.

Defendant's cross-motion for judgment on the AR is **GRANTED**.

Intervenor's cross-motion for judgment on the AR is **GRANTED**.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**